IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENIO PENA, | No. C 05-2844 MJJ (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| vs. | |
| JILL BROWN, | |
| Respondent. | |

Petitioner, a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2004 decision by the California Board of Parole Hearings ("Board")[1] finding him unsuitable for parole. Respondent has filed an answer, and petitioner has filed a traverse.

## BACKGROUND

In 1992, petitioner was convicted in San Mateo County Superior Court of first-degree attempted murder with use of a firearm, and causing great bodily injury. On May 11, 1993, he was sentenced to a term of life plus 11 years in state prison. In 2004, when petitioner had served approximately 11 years of his sentence and prior to his minimum eligible parole date of February 22, 2005, the California Board of Prison Terms (the "Board") held petitioner's

---

[1] At the time of the decision, the Board was called the California Board of Prison Terms.

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd

first parole hearing. The Board found him unsuitable for parole at that time. He challenged this decision unsuccessfully in habeas petitions filed at all three levels of the California courts.

## DISCUSSION

### A. Standard of Review

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgement of a State court only on the ground that he is in custody in violation of the Constitution or the laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). Under AEDPA, this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. Early v. Packer, 537 U.S. 3, 8 (2002) (quoting Williams, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court may also grant

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd                2

the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Rice v. Collins, 126 S. Ct. 969, 975 (2006).

B.   Analysis of Claim

   1.   Basis for Board's Decision

Petitioner claims that the Board's decision violated his right to due process because it was not based on the factors set forth in its own regulations and because the decision was not supported by "some evidence." A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128-29 (9th Cir. 2006) (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)); see also Irons v. Carey, 479 F.3d 658 (9th Cir. 2007).[2] The standard of "some evidence" is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced. See Hill, 472 U.S. at 455. An examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence. Id. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the [administrative] board. See id. Additionally, the evidence underlying the Board's decision must have some indicia of reliability. McQuillion v. Duncan, 306 F.3d 895, 904 (9th Cir. 2002).

In assessing whether or not there is "some evidence" supporting the Board's denial of parole, this Court must consider the regulations which guide the Board in making its parole suitability determinations. California Code of Regulations, title 15, section 2402(a) states that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk

---

[2]Respondent argues that the Ninth Circuit is wrong in finding Hill's "some evidence" requirement applicable to parole denials. This Court, of course, has no discretion to disregard or overrule applicable decisions from the Ninth Circuit.

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd          3

of danger to society if released from prison." The regulations direct the Board to consider "all relevant, reliable information available." 15 Cal. Code of Regs. § 2402(b). Further, they list sets of circumstances tending to indicate whether or not an inmate is suitable for parole. 15 Cal. Code of Regs. § 2402(c)-(d).

The circumstances tending to show an inmate's unsuitability are: (1) the commitment offense was committed in an "especially heinous, atrocious or cruel manner;" (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as a "lengthy history of severe mental problems related to the offense;" and (6) prison misconduct. 15 Cal. Code of Regs. § 2402(c). The circumstances tending to show suitability are: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress which built up over time; (5) Battered Woman Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law. 15 Cal. Code of Regs. § 2402(d). These circumstances are meant to serve as "general guidelines," giving the Board latitude in the weighing of the importance of the combination of factors present in each particular case. 15 Cal. Code of Regs. § 2404(c). Once the prisoner has been found suitable for parole, the regulations set forth a matrix to set a base term. 15 Cal. Code Regs. § 2403(a).[3]

The California Supreme Court has found that the foregoing statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. In re Dannenberg, 34 Cal. 4th 1061, 1070-71 (2005).

While subdivision (a) of section 3041 states that indeterminate life (i.e., life-

---

[3]The matrix provides three choices of suggested base terms for several categories of crimes: for attempted first degree murders, the matrix of base terms ranges from the low of 7, 8 or 9 years, to a high of 10, 11 or 12 years, depending on certain facts of the crime. 15 Cal. Code Regs. § 2403(d). One axis of the matrix concerns the relationship between defendant and victim and the other axis of the matrix concerns the amount of harm inflicted. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the circumstances of the murder are "minor injury," "victim assaulted," "major injury," or "torture." Each of the choices are further defined in the matrix. Id.

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd              4

> maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies *"unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises *"public safety"* concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis, brackets, and parentheses as in original). In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." Id. at 1071. The California Supreme Court's determination of state law is binding in this federal habeas action. Hicks v. Feiock, 485 U.S. 624, 629 (1988).

Here, the Board denied parole on the basis of the facts of petitioner's commitment offense, an unstable social history, and the District Attorney's opposition to parole.

### a. Commitment Offense

Under state law, the Board may consider the gravity of the commitment offense in assessing an inmate's suitability for parole. Cal. Penal Code § 3041(b); 15 Cal. Code Regs, § 2402(c)(1). The factors to be considered in determining whether the offense was committed in an "especially heinous, atrocious or cruel manner," so as to indicate unsuitability are whether: (1) "multiple victims were attacked, injured or killed in the same or separate incidents;" (2) the offense was committed in "a dispassionate and calculated manner, such as an execution-style murder;" (3) "the victim was abused, defiled or mutilated during or after the offense;" (4) the offense was committed in a manner demonstrating "an exceptionally callous disregard for human suffering;" and (5) "the motive for the crime is explicable or very trivial in relation to the offense." Id.

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time,

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd  5

to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002) ("The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense."). Moreover, the federal constitutional guarantee of due process does not preclude the parole board from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. Sass, 491 F.3d at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing); Irons, 479 F.3d at 660, 665 (finding commitment offense and prior offenses amounted to some evidence to deny parole).

The facts of the offense are as follows:[4]

### 1. **Offense Summary**

On January 11, 1992, Palo Alto police officers went to 1957 Cooley Avenue #34 East Palo Alto, to serve a search warrant. Upon their arrival, one of the officers knocked on the door and announced their presence in both English and Spanish. No one responded. The door was then forced open, and five officers entered the apartment. Eugenio Pena [] was seen near the bedroom door. He was armed with a pistol and had it extended toward the officers. The Spanish-speaking officer kept telling the defendant to put the gun down. A gunshot was heard and the officers returned fire with their service revolvers. The officers, who feared for their lives were ordered to pull back and exit the apartment, which they did after multiple rounds of fire. After the gunfire stopped and the officers regrouped outside, an officer assigned to guard the rear of the apartment complex saw a hand open the rear window of the apartment and throw out an object which later turned out to be cocaine and heroin. In the meantime, the subject called 911 for assistance. A rescue team comprised of three of the original entry team was sent in. The subject asked if they "had got those guys", as if he had been robbed by a group of suspects. Upon securing the residence both the defendant and a female were located in the apartment. A cursory look into the bedroom revealed a blue steel revolver on the floor. A small infant was also found in the bedroom. He was unharmed.

During the exchange of gunfire both the subject and the female companion were injured. They were transported to the hospital and the infant was turned over to Children's Protective Custody.

---

[4]This summary is set forth in the "Life Prisoner Evaluation Report" prepared for the Board at the 2004 parole hearing. (Resp. Ex. 5.)

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd        6

## 2. **Prisoner's Version**

"On January 11, 992, I was at 1957 Cooley Ave. Apt. #34, East Palo Alto, Ca. I was asleep with Marina Yanez, my common law wife and our son Eduardo Pena, who was only 42 days old. I was still drunk from drinking the night before. It was still dark when I was awakened by a huge noise in the living room. It was the front door. I didn't know what it was. All that I saw was the door open and some dark shadows moving. A few months before this incident, I was robbed by some people who broke down my door and said they were police officers. They were not, they were thieves. This time when my door was broke down that was my thought. It was thieves again. I never heard anything that indicated they were police officers. They say that they were shouting, "Police", "Police". I was so drunk and asleep that I never heard it. I was awakened by the gunshots. My common-law wife said that when she heard the words "Police," but I didn't hear it. I then reached for my 22 pistol, which I kept in a drawer next to my bed. I got shot and I then began to fire my gun in the air. To this day, I cannot recall how I fired my gun. However, the Palo Alto Swat Team fired over forty rounds. Three bullets hit me. My common law wife Marina Yanez was also hit three times. A miraculous thing occurred. My son was unharmed although more than ten rounds hit his mattress where he was sleeping.

After the gunfire was over, I crawled to the telephone and dialed 911. The dispatcher began to question me thoroughly regarding the incident until I was tired of explaining it to her, so I hung up. I then called to a friend who I asked for help. The dispatcher called me back and for forty-five minutes we went back and forth, after which the Palo Alto Swat Team finally came back to the apartment and arrested my common law wife and me. We were left in the apartment for more than forty-five minutes, seriously injured by the gunshot wounds. After I was arrested, I found out that I had a small amount of cocaine in my wallet.

As I look back at this whole event, I take full responsibility for my actions. I in no way blame anyone else for my actions. I realize that I did not only place myself in danger, but also my whole family, and the police. If anything I should have covered my son, wife and myself."

(Resp. Ex. 5 at 1-2.)

The foregoing facts of the offense provided some evidence that the crimes were carried out with a "callous disregard" for the risk of harm to others. 15 Cal. Code Regs. § 2402(c)(1). There was evidence that the officers had identified themselves as such both in English and Spanish, that they wore police uniforms, and that they were carrying a shield which said "Police" clearly on it. (Resp. Ex. 2 at 51-55.) There was evidence that petitioner withdrew his gun and fired it before the officers did, despite the presence of his infant son and common-law wife in the apartment. The result was that his wife was shot three times and ten bullets hit the mattress of his son. When petitioner fired his gun in the presence of so many armed men who were instructing him to put the gun down, even if

petitioner did not believe believed they were police, he created a great likelihood that shots would be returned within a relatively small space where his unarmed wife and infant son were present. Under such circumstances, petitioner's not complying with the police orders and instead firing a gun constitutes "some evidence" that petitioner acted with a "callous disregard" for the safety of others such that he was not suitable for parole under the pertinent California regulations.

Petitioner raises the concern expressed by the Ninth Circuit in <u>Biggs v. Terhune</u> that "over time" the Board's "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment" would "raise serious questions involving his liberty interest in parole." 334 F.3d 910, 916 (9th Cir. 2003). The Ninth Circuit has recently criticized this statement as beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." <u>Sass,</u> 461 F.3d at 1129. In any event, in this case, petitioner had only served approximately 11 years when parole was denied, and he had not yet reached his minimum parole eligibility date. <u>Cf.</u> <u>Irons</u>, 479 F.3d at 660, 665 (finding facts of commitment offense and prior history alone sufficient evidence to deny parole where inmate had not yet served minimum term of sentence). Moreover, the challenged parole denial here was based on other evidence in addition to the commitment offense and criminal history, as described below. Therefore, the instant case does not implicate the concerns raised in <u>Biggs</u>.

   b.  Additional Factors

The Board commended petitioner on his lack of criminal history, his lack of discipline in prison, his in-prison participation in work, education and vocational programs, his participation in self-help programs, his parole plans, and his good employment prospects upon his release. (Resp. Ex. 2 at 28-45.) However, the Board did find evidence that petitioner had an unstable social history insofar as he admitted being drunk at the time of the offense, and drugs were found both in his wallet and in the bag thrown out of his window. (<u>Id.</u>) Such evidence weighed against granting parole under the regulations. <u>See</u> 15 Cal. Code Regs. §§ 2402(c)(3) & (d)(2). The Board also noted the opposition of the District Attorney to petitioner's release on parole. <u>See</u> Cal. Pen. Code § 3042.

In sum, the record demonstrates "some evidence," including but not limited to the facts of the offense, that Petitioner was unsuitable for parole under the factors set forth in California's statutes

and regulations for determining parole suitability. The Board's decision did not violate Petitioner's right to due process, and the state court opinions upholding the Board's denial of parole are neither "contrary to" or an "unreasonable application of "clearly established Federal law." 28 U.S.C. § 2254(d)(1). Further, the Board's decision was not based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," because there was "some evidence" in the record to support the finding of Petitioner's unsuitability for parole. 28 U.S.C. 2254(d)(2).

2.      Petitioner Was Not Denied Parole Based on an Anti-Parole Policy

Petitioner claims that the Board's policy of denying parole to almost all indeterminately sentenced inmates violates his right to due process. Even assuming petitioner could show the existence of such a policy, the transcript of the proceeding and the decision in this case show that the Board considered petitioner's suitability on an individual basis and in considerable detail. (Resp. Ex. 2.) The decision reflects this individualized treatment of petitioner's case. As described above, the decision was based on more than petitioner's commitment offense and his status as an inmate with an indeterminate sentence. Based on the records presented to the Court, there is no indication that the Board's decision was based on an "Anti-Parole Policy," as opposed to the particular factors of petitioner's case. As a result, habeas relief is not warranted on this claim.

//

//

# CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 12/17/2007

MARTIN J. JENKINS
United States District Judge

G:\PRO-SE\MJJ\HC.05\pena.dny.wpd                    10